M. KENDALL DAY
Chief, Asset Forfeiture and
Money Laundering Section (AFMLS)
MARY BUTLER
Deputy Chief, AFMLS
DANIEL H. CLAMAN
Principal Assistant Deputy Chief, AFMLS
MICHAEL W. KHOO
Trial Attorney, AFMLS
    Criminal Division
    United States Department of Justice
    1400 New York Avenue NW, 10th Floor
    Washington, D.C. 20530
    Telephone:  (202) 514-1263
    Email:  michael.khoo@usdoj.gov

EILEEN M. DECKER
United States Attorney
STEVEN R. WELK
Assistant United States Attorney
Chief, Asset Forfeiture Section
JONATHAN GALATZAN
Assistant United States Attorney
    312 North Spring Street, 14th Floor
    Los Angeles, California 90012
    Telephone:  (213) 894-6166
    Email:   jonathan.galatzan@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA


                    UNITED STATES DISTRICT COURT

              FOR THE CENTRAL DISTRICT OF CALIFORNIA


UNITED STATES OF AMERICA,          ) No. SACV 15-1110 JVS (DFMx) _
                                   )
          Plaintiff,               )
                                   )
     vs.                           ) FIRST AMENDED VERIFIED
                                   ) COMPLAINT FOR FORFEITURE
                                   ) *IN REM*
THE PROCEEDS FROM THE SALE OF A    )
CONDOMINIUM LOCATED AT THE         )
RITZ-CARLTON IN LOS ANGELES,       ) [18 U.S.C. § 981(a)(1)(A),
CALIFORNIA; REAL PROPERTY          ) 18 U.S.C. § 981(a)(1)(C)]
LOCATED AT 620 W. ORANGEWOOD       )
AVENUE IN ANAHEIM, CALIFORNIA;     )
REAL PROPERTY LOCATED AT 19545     )
E. CIENEGA AVENUE IN COVINA,       )

CALIFORNIA; REAL PROPERTY )
LOCATED IN IRVINE, CALIFORNIA; )
THE ASSETS OF THE ANAHEIM )
EXPRESS INN; ONE 2007 PORSCHE )
BOXSTER; AND 4,275 SHARES IN )
SOLUTION STRATEGIES )
INTERNATIONAL, INC., )
                                    )
              Defendants.           )
_____ )

Plaintiff United States of America, by and through its undersigned attorneys, in a case of forfeiture *in rem*, alleges, based on information and belief, that:

**I.**

**<u>NATURE OF THE ACTION</u>**

1.  This is an action *in rem* to forfeit three real properties in the Central District of California (referred to collectively as the "Defendant Real Properties"), a Porsche Boxster, shares in a consulting business, the assets of a motel, and approximately $1 million in funds connected to the massive corruption schemes of Janet Lim Napoles – who, through nearly a decade of bribes, kickbacks, and embezzlement, is believed to have stolen over $200 million from the Philippines' government intended for development assistance and disaster relief aid for the people of the Philippines.

2.  As alleged herein, between approximately 2004 through 2012, Janet Lim Napoles ("Napoles"), a citizen of the Philippines, arranged for Philippine politicians and government officials to award over $200 million in government contracts to non-governmental organizations (NGOs) ("Napoles NGOs") under her control in exchange for kickbacks.  In order to maintain control, she appointed her family members, employees, and household staff as officers of the NGOs, sometimes without their knowledge.  Her NGOs then either failed entirely to provide the services they had promised, overcharged, or under-delivered, while Napoles diverted to her own personal use and benefit money intended for expenditures for the public good, often draining accounts in cash within days of government disbursements to her NGOs.

3.  Napoles engaged in three principal schemes: (a) The "pork-barrel" or PDAF scam: Between approximately 2004 and 2012, Napoles paid kickbacks to Philippine legislators and their staff in exchange for the award of contracts for projects paid from Priority Development Assistance Funds (PDAF), which were not implemented as promised, and sometimes not at all; (b) The Malampaya Fund scam: In 2009, at Napoles's direction, employees of her NGOs forged letters from mayors and falsified reports of NGO service delivery in order to obtain approximately $20

million from the Philippines' Malampaya Fund, under the false promise that the funds would be used for typhoon recovery work; and (c) The Fertilizer Fund scam:  In or about 2004, Napoles paid kickbacks to government officials for the award of government supply contracts for fertilizer sold at inflated prices and/or sub-standard quality.  Through these criminal schemes, and in violation of Philippine law, Napoles obtained tens of millions of dollars for her own benefit, at a time when she and her family had little or no legitimate income.

4.  As set forth in more detail below, over the period from roughly 2006 to 2012, Napoles caused approximately $12 million of stolen Philippine government funds to be transferred to the United States.  At her direction, government-awarded funds were often withdrawn from Napoles NGO accounts in cash and transferred to the United States, usually through the use of money changers and remittance services, concealing the true source of the funds.  These monies were usually wired to bank accounts in the United States that had been opened in the names of Napoles's family members and two California corporations controlled by the Napoles family and created in 2006, shortly before the first of the defendant properties was acquired: Western Investment Corporation ("Western Investment") and

4

Western Ventures Management, Inc. ("Western Ventures Management").

5.   In 2013, the Philippines' National Bureau of Investigation ("NBI") rescued former Napoles employee Benhur Luy from a Napoles-owned condominium in Manila after he had been kidnapped and illegally detained by Napoles against his will for several months.   Luy, a cousin of Napoles, had worked for her as a finance officer, tracking many of her corrupt transactions. Napoles detained Luy in 2012, having suspected him of engaging in side transactions.   After his rescue, Luy, as well as other former Napoles employees, began cooperating with the Philippine government's investigation and provided details of how Napoles's scams operated.

6.   Napoles was subsequently convicted on April 14, 2015 of Serious Illegal Detention and received a sentence of life imprisonment, or between 20 years and one day up to 40 years. Her brother, Reynald Lim ("Lim"), who was charged with the same offense, remains a fugitive.   The Philippines government has also charged Napoles and certain of her family members with misappropriating government funds and paying kickbacks in the PDAF scam.

7.   The defendants were acquired with or represent the proceeds of at least $12.5 million in public funds that were

5

looted and subsequently laundered into the United States during the period from in or about 2004 to in or about 2012 through schemes described herein.  As property constituting, derived from, or traceable to the proceeds of "specified unlawful activity," or a conspiracy to commit specified unlawful activity, and as property involved in money laundering violations of 18 U.S.C. §§ 1956 and 1957, the defendants are subject to forfeiture under 18 U.S.C. § 981(a)(1)(C) and (A).

## II.

## THE DEFENDANTS

### A. Defendant Real Properties

#### a. The Anaheim Motel

8.  The Defendant Anaheim Motel, as more fully described in Attachment A, is titled in the name of Western Investment, located at 620 W. Orangewood Ave., Anaheim, California, 92802, and includes all appurtenances, improvements, and attachments thereon, as well as all leases, rents, and profits derived therefrom.  The Anaheim Motel is currently operated as a motel called the Anaheim Express Inn.  It was acquired in 2006, and is managed for Western Investment by a management company.

#### b. The Covina Real Property

9.  The Defendant Covina Real Property, as more fully described in Attachment B, is titled in the name of Western

Ventures Management, located at 19545 E. Cienega Ave., Covina, California, 91724, and includes all appurtenances, improvements, and attachments thereon, as well as all leases, rents, and profits derived therefrom.  In the past, the Covina Real Property was operated as a day care or school, but, as of the date of filing of this complaint, there was no day care, school, or other organization operating from the property.

### c. The Irvine House

10.  The Defendant Irvine House, as more fully described in Attachment C, is currently titled in the name of Ana Marie D. Lim, located in Irvine, California,[1] and includes all appurtenances, improvements, and attachments thereon, as well as all leases, rents, and profits derived therefrom.  It was acquired in 2007, and originally titled in the name of Reynald and Ana Marie Lim.

### B. The Ritz-Carlton Proceeds

#### a. $984,173.40 In Proceeds From the Sale of A Condominium at the Ritz-Carlton Residences in Los Angeles, California ("Ritz-Carlton Proceeds")

11.  The Defendant Ritz-Carlton Proceeds are $984,173.40 in proceeds from the June 2014 sale of Unit 37I at the Ritz-Carlton

---

[1] Pursuant to Local Rule 5.2-1, residential addresses have been omitted from this complaint.

7

Residences in Los Angeles, California, which was purchased in

2011 by Janet Napoles for her 21-year-old daughter, Jeane

Napoles (the "Ritz-Carlton Residence").  The Ritz-Carlton

Proceeds are more fully described as all funds seized pursuant

to a seizure warrant issued on August 6, 2014, by the U.S.

District Court for the Central District of California from the

following four accounts:

   - $156,286.19 seized on August 6, 2014, from Bank of

America Checking Account number 325031121361, held in the

name of Jeane Napoles ("Jeane Napoles Bank of America 1361

Checking Account");

   - Approximately $106,468.11 seized on August 6, 2014, from

Citibank Flexible Checking Account number 205786502, held

in the name of ImFashioNinja LLC ("ImFashioNinja Checking

Account");[2]

   - Approximately $565,854.39 seized on August 6, 2014, from

Citibank Business IMMA Account number 205786510, held in

_____

   [2] At the time of the service of the seizure warrant on
August 6, 2014, the account balances in the ImFashioNinja
Checking Account, the ImFashioNinja IMMA Account, and the Jeane
Napoles Citibank Checking Account were $106,468.11, $564,854.39,
and $156,693.29, respectively, for a total of $829,015.79.  On
August 15, 2014, the United States received a single cashier's
check from Citibank for the seized funds from all three
accounts.  That check was in the amount of $827,887.21, which is
$1,128.58 less than the account balances as of the date of
service of the seizure warrant.  Thus, the Ritz-Carlton Proceeds
include $827,887.21 from the three Citibank accounts from which
funds were seized.

the name of ImFashioNinja LLC ("ImFashioNinja IMMA Account"); and

- Approximately $156,693.29 seized on August 6, 2014, from Citibank Checking Account number 42012282622, held in the name of Jeane Napoles ("Jeane Napoles Citibank Checking Account").

12.   The Ritz-Carlton Proceeds are currently in the custody of the United States Marshals Service and shall remain subject to the Court's jurisdiction during the pendency of this action.

## C. **Defendant Business Assets**

13.   The Defendant Business Assets are more fully described as: all assets related to the Anaheim Motel, including but not limited to all chattels and intangible assets, inventory, and equipment owned, held or maintained by Western Ventures Management, Western Investment, or the Anaheim Motel, including any and all funds in accounts owned, held or maintained by Western Ventures Management, Western Investment, or the Anaheim Motel, or for the benefit of Western Ventures Management, Western Investment, or the Anaheim Motel, at financial institutions, including but not limited to the following:

a.   All funds and/or securities held in Chase Money Market Account/Business Savings Account # 3072393506 (in the name of Western Investment's hotel management company);

9

b.   All funds and/or securities held in Chase Operating
Account # 563766539 (in the name of Western Investment's
hotel management company);

c.   All funds and/or securities held in Chase Managers
Account # 563767867 (in the name of Western Investment's
hotel management company).

**D. Defendant Porsche**

14.   The Defendant Porsche is identified as a 2007 Porsche
Boxster, Vehicle Identification Number WPOCA29897U710807,
license plate 6AKA322, registered to Jo Christine Napoles at the
address of the Irvine House.  As of the date of filing this
First Amended Complaint, the Defendant Porsche was in the
custody of the U.S. Marshals Service.

**E. Defendant Solution Strategies Shares**

15.   The Defendant Solution Strategies Shares are described
as follows:  4,275 shares of stock of Solution Strategies
International, Incorporated ("Solution Strategies"), a
California corporation, held in the name of Janet Lim Napoles.
Solution Strategies is a consulting company headquartered in
California.  Napoles's share represents 19% of the company.  As
of the date of filing of this First Amended Complaint, the
Defendant Solution Strategies Shares were in the custody of the
U.S. Marshals Service.

10

### III.

### JURISDICTION AND VENUE

16. The United States brings this action *in rem* to forfeit and condemn the defendant assets. This Court has jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345, and over an action for forfeiture under 28 U.S.C. § 1355(a).

17. This Court has *in rem* jurisdiction over the defendant assets under 28 U.S.C. § 1355(b).

18. Venue is proper in this district pursuant to 28 U.S.C. § 1355(b)(1) because acts or omissions giving rise to the forfeiture occurred in this district.

### IV.

### STATUTORY BASES FOR FORFEITURE

19. The defendants are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) because they are property constituting or derived from proceeds traceable to an offense constituting a "specified unlawful activity" or a conspiracy to commit such an offense. "Specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7)(A) and (c)(7)(B)(iv) to include, among other things, (i) foreign offenses involving "the misappropriation, theft, or embezzlement of public funds by or for the benefit of

11

a public official"; (ii) foreign offenses involving bribery of a public official; (iii) transportation of stolen or fraudulently obtained money (18 U.S.C. § 2314); and (iv) receipt of stolen money (18 U.S.C. § 2315).

20.   The defendants are also subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because they constitute property involved in one or more transactions or attempted transactions in violation of 18 U.S.C. § 1957, or are property traceable to such assets.  Section 1957 prohibits the conducting of a monetary transaction with property known to be the proceeds of unlawful activity with a value greater than $10,000, *i.e.*, the proceeds of (i) a foreign offense involving the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official; (ii) a foreign offense involving bribery of a public official; (iii) transportation of stolen or fraudulently obtained money (18 U.S.C. § 2314); or (iv) receipt of stolen money (18 U.S.C. § 2315). *See* 18 U.S.C. §§ 1956(c)(7)(B)(iv) and 1956(c)(7)(A) (incorporating by reference offenses enumerated in 18 U.S.C. § 1961(1)).

21.   The defendants are also subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because they constitute property involved in one or more transactions or attempted transactions in violation of 18 U.S.C. § 1956(a)(1)(B), or are property

12

traceable to such assets.  Section 1956(a)(1)(B) prohibits the conducting of a financial transaction with property known to be the proceeds of unlawful activity with the intent to conceal the nature, location, source, ownership, or control of such proceeds, i.e., (i) a foreign offense involving the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official; (ii) a foreign offense involving bribery of a public official; (iii) transportation of stolen or fraudulently obtained money (18 U.S.C. § 2314); or (iv) receipt of stolen money (18 U.S.C. § 2315). See 18 U.S.C. §§ 1956(c)(7)(B)(iv) and 1956(c)(7)(A) (incorporating by reference offenses enumerated in 18 U.S.C. § 1961(1)).

22.  The defendants are further subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because they constitute property involved in one or more transactions or attempted transactions in violation of 18 U.S.C. § 1956(a)(2), or are property traceable to such assets.  Among other conduct, Section 1956(a)(2) prohibits transferring funds known to be the proceeds of unlawful activity from a place outside the United States to a place in the United States, with knowledge that the transfer is designed in whole or in part to conceal the nature, location, source, ownership, or control of proceeds of a specified unlawful activity.  Specified unlawful activity again includes

13

(i) a foreign offense involving the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official; (ii) a foreign offense involving bribery of a public official; (iii) transportation of stolen or fraudulently obtained money (18 U.S.C. § 2314); or (iv) receipt of stolen money (18 U.S.C. § 2315). *See* 18 U.S.C. §§ 1956(c)(7)(B)(iv) and 1956(c)(7)(A) (incorporating by reference offenses enumerated in 18 U.S.C. § 1961(1)).

23. In addition, the defendants are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because they constitute property involved in a conspiracy to violate 18 U.S.C. § 1956 or 18 U.S.C. § 1957, in violation of 18 U.S.C. § 1956(h).

24. The foreign offenses referenced above are criminalized under the law of the Philippines by at least Republic Act Nos. 3019 (the Anti-Graft and Corrupt Practices Act), 7080 (Plunder) and Article 212 of the Revised Penal Code (Corruption of Public Officials). These provisions are set forth in Attachment D.

**V.**

**FACTS**

25. On information and belief, the United States alleges the following facts.

14

A. **Relevant Individuals, Entities, and Terms**

26. The following individuals, entities, and terms are particularly relevant to this complaint.

1. ***Janet Lim Napoles ("Napoles").*** Janet Napoles is the Philippine businesswoman behind the PDAF scam and other schemes to steal millions of dollars from the Philippine government. Napoles has been convicted of illegal detention and has been charged in the Philippines with various corruption offenses related to conduct alleged herein. Napoles is married to Jaime Napoles, and has four children: Jo Christine, James Christopher, Jeane Catherine, and John Christian Napoles.

2. ***Reynald and Ana Marie Lim.*** Reynald Lim, Janet Napoles's brother, is currently wanted in the Philippines based on criminal charges for his role in kidnapping whistleblower Benhur Luy. He holds both United States and Philippine passports. Until they departed for the Philippines in or around December 2012, Lim and his wife, Ana Marie Lim, lived in the Irvine House. He was listed as the registered agent and an officer for Western Ventures Management and Western Investment, the Napoles family companies that purchased and owned two of the defendants, the Anaheim Motel and the Covina Real Property. Reynald and Ana Marie Lim (using the aliases Reynaldo L. Francisco and Ana Marie B. Dulguime) were convicted in the Philippines in 2010 of falsifying public documents in connection with procurement fraud involving the delivery of Kevlar helmets to the Philippine marines.

3. ***Jo Christine Napoles.*** Jo Christine Napoles, the older daughter of Janet Napoles, was born in 1984. She was an officer of Western Ventures Management and Western Investment, which began acquiring some of the defendant property when she was 22 years old. Jo Christine Napoles also purchased the Defendant Porsche using stolen funds. In June,

2014, she was charged by the government in the Philippines in connection with the PDAF scam.

4. **James Napoles.** James Napoles, the older son of Janet Napoles, was born in 1985. A citizen of the Philippines, James Napoles was named as an officer in Western Investment and Western Ventures Management, which began acquiring certain defendant property when he was 21 years old. In June, 2014, he was charged by the government of the Philippines in connection with the PDAF scam.

5. **Jeane Napoles.** Jeane Napoles is the younger daughter of Janet Napoles, born in 1990. After graduating from high school, in June 2009, Jeane Napoles began an Associate of Arts degree program at the Fashion Institute of Merchandising and Design in Los Angeles in July, 2010, but withdrew in October, 2012. In 2011, at the age of 21, she moved into a condominium in the Ritz-Carlton in Los Angeles that was purchased by her mother using stolen funds. Jeane Napoles used the proceeds of the sale of the condominium in June 2014 to attempt to launch and run a fashion business called ImFashioNinja. On August 27, 2014, Jeane Napoles left the United States. She has been charged in the Philippines with tax evasion.

6. **Benhur Luy.** Benhur Luy, a cousin of Napoles, was in charge of financial records for Napoles's company JLN Corporation and other entities from 2002 until December of 2012, when Napoles and Lim detained Luy. Napoles also appointed Luy president of one of the NGOs she controlled. After being rescued from detention in March, 2013, Luy began cooperating with the government in its investigation of Napoles's scams.

7. **The principal money remitters: Edzen Enterprises, Key West Trading, Hector Ang, and Michael Ty.** At all times relevant to the complaint, Edzen Enterprises and Key West Trading, both based in Manila, Philippines, were the principal money-remitters and foreign exchange dealers used by Janet Napoles to send stolen funds from the Philippines to the United States. Key West was,

at all times relevant to the complaint, owned by Hector Ang, who used both his personal and Key West bank accounts to operate his business. Edzen Enterprises was operated by an individual named Stephen Teung. Napoles also used an individual in the Philippines named Michael Ty to send stolen funds to the United States. On March 25, 2014, the accounts of Hector Ang, Michael Ty, and Edzen Enterprises were frozen based on their connection to the PDAF scam.

8. ***Western Investment and Western Ventures Management.*** At all times relevant to the complaint, Western Investment and Western Ventures Management were California companies established by the Napoles family and controlled by Janet Napoles. Napoles caused millions of dollars of her criminal proceeds to be transferred to these companies in order to buy some of the defendant properties in their names. Their officers included Napoles's brother Reynald Lim and her children James and Jo Christine.

## B. **Napoles's Theft of Public Funds through the PDAF Scam**

27. Napoles's longest-running scheme is known as the PDAF scam or the "pork barrel scam," through which Napoles and her associates are believed to have siphoned off approximately Php 10 billion Philippine pesos ("Php")(approximately USD $225 million) in government funds over an eight-year period, Php 3 billion (approximately USD $67.5 million) of which went to Napoles.[3]

---

[3] Conversions from Philippine pesos to U.S. dollars are approximate, and are based on the January 1, 2014, exchange rate of 44.4 Philippine pesos per U.S. dollar.

28.  At all times relevant to the complaint, PDAF was a lump-sum appropriation under the control of individual members of the Senate and House of Representatives in the Philippines, who had discretion to assign PDAF to particular development projects.  Members of the Philippine legislature could use PDAF to fund programs such as small-scale infrastructure or community development projects.

29.  Philippine law provides that PDAF funds must be allocated to specific types of projects, following procurement and public bidding procedures, accountable implementing agencies and audit reviews, among other safeguards.

30.  In exchange for kickbacks, legislators promised to and did designate certain Napoles NGOs as the recipients of funds for the ostensible purpose of implementing development projects previously authorized by the Philippine Department of Budget and Management ("DBM").  Napoles agreed to and did pay legislators kickbacks equaling approximately 40-60% of the cash value of each project.  She also paid approximately 5% to the legislators' staffs and 10% to agency officials who released funds to her NGOs as directed.  Napoles then under-delivered on or overcharged for the projects, and often completely failed to implement them, pocketing the remaining funds for herself.

### a. The Napoles NGOs were Awarded Millions of Dollars' Worth of PDAF Monies in Exchange for Millions of Dollars' Worth of Kickbacks

31.   To obtain PDAF monies, senators submitted lists of proposed projects to the Senate President and Finance Committee Chair, and members of the House of Representatives submitted lists to the House Appropriation Committee, requesting the release of PDAF funds.  The DBM, in turn, issued special allotment release orders ("SAROs") to the legislators, who then endorsed Napoles NGOs as "project partners" to particular government implementing agencies for each project.  Although PDAF projects were intended to be implemented by designated government agencies, as project partners, the Napoles NGOs were approved to receive PDAF funds to acquire and provide items such as agricultural tools, vegetable seeds, fertilizer, uniforms, and other supplies that could be used to start small businesses.

32.   The DBM would later issue a Notice of Cash Allocation, triggering the release of government funds to the Napoles NGO.  Napoles NGOs received PDAF funds by check, which Napoles's employees deposited into the Napoles NGOs' accounts.  Once the Napoles NGOs received the money to implement projects, Napoles began to quickly withdraw these monies from the NGOs' accounts (usually in cash) to pay kickbacks and for her own personal use.

19

33.  Napoles would sometimes advance as much as 50% of the kickback once the legislator requested a release of the PDAF funds from the relevant legislative committee.  Once the kickback was paid, the lawmaker would send a letter furnishing the name of the Napoles NGO to the implementing agency.   The remaining balance of the agreed kickbacks were paid later, after the SARO or Notice of Cash Allocation was issued, or after the NGO received funds.

34.  For example, during 2007 and 2009 alone, three Senators - Juan Ponce Enrile, Ramon M. Revilla, Jr. (a/k/a Bong Revilla), Jose P. Ejercito Estrada (a/k/a Joseph Estrada, a/k/a Jinggoy Estrada) (collectively, "the Senators") - unlawfully caused at least approximately $26 million in PDAF money to be distributed to Napoles's NGOs, including:

**TABLE 1 - PDAF Awarded by Senators to Napoles NGOs, 2007-2009**

| Senator | 2007-2009 PDAF Given to Designated Agencies and Napoles NGOs | Designated Implementing Agencies | Designated Napoles NGOs |
|---|---|---|---|
| Enrile | Php 345,000,000 ($7.77 million) | National Agribusiness Corporation (NABCOR); National Livelihood Development Corporation | Agri and Economic Program for Farmers Foundation, Inc. (AEPFFI); Agricultura Para Sa Magbubukid Foundation, Inc. (APMFI); Countrywide Agri and Rural Economic |

| | | (NLDC); Technology Resource Center (TRC) | Development Foundation, Inc. (CARED); Masaganang Ani Para Sa Magsasaka Foundation, Inc. (MAMFI); People's Organization for Progress and Development Foundation, Inc. (POPDFI); Social Development Program for Farmers Foundation, Inc. (SDPFFI) |
|---|---|---|---|
| Estrada | Php 278,000,000 ($6.26 million) | Same | MAMFI; SDPFFI |
| Revilla | Php 517,000,000 ($11.64 million) | Same | AEPFFI; APMFI; MAMFI; Philippine Social Development Fund, Inc. (PSDFI); SDPFFI |

35.   Napoles caused payments to be made to each of these three senators in exchange for the abuse of their official position to award PDAF funds to her NGOs.  Napoles's kickback payments to the Senators and their staff began in 2004 and continued through 2012, in at least the following amounts:

TABLE 2 – Kickbacks to Senators and Staff

| Year | Kickback (Php) | Recipient |
|---|---|---|
| 2004 | 1,500,000.00 | Senator Enrile and staff |
| 2004 | 1,500,000.00 | Senator Estrada and staff |
| 2005 | 14,622,000.00 | Senator Enrile and staff |
| 2005 | 16,170,000.00 | Senator Estrada and staff |
| 2006 | 13,300,000.00 | Senator Enrile and staff |
| 2006 | 12,750,000.00 | Senator Estrada and staff |
| 2006 | 10,000,000.00 | Senator Revilla and staff |
| 2007 | 27,112,500.00 | Senator Enrile and staff |
| 2007 | 16,250,000.00 | Senator Estrada and staff |
| 2007 | 61,000,000.00 | Senator Revilla and staff |

21

| 2008 | 62,550,000.00 | Senator Enrile and staff |
| 2008 | 51,250,000.00 | Senator Estrada and staff |
| 2008 | 80,000,000.00 | Senator Revilla and staff |
| 2009 | 23,750,000.00 | Senator Enrile and staff |
| 2009 | 2,200,000.00 | Senator Estrada and staff |
| 2009 | 40,000,000.00 | Senator Revilla and staff |
| 2010 | 30,000,000.00 | Senator Enrile and staff |
| 2010 | 73,923,750.00 | Senator Estrada and staff |
| 2010 | 33,512,500.00 | Senator Revilla and staff |
| 2012 | 9,750,000.00 | Senator Estrada and staff |

36.   Records maintained by Napoles's former finance officer Luy show cash payments of kickbacks funded directly by withdrawals from NGO accounts.   Rather than create records that included the Senators' real names, Napoles's employees often used code names assigned to particular officials in documents they used to keep track of the kickbacks paid.   Reynald Lim or Jo Christine Napoles inspected many of Luy's reports tracking the payment of kickbacks.

37.   Most of the kickbacks to lawmakers and their staff were paid in cash at Napoles's office.   In one instance, cash given to Ruby Tuason (an intermediary for Senator Estrada) was so heavy that Napoles's secretary had to help Tuason move it all.   Tuason then delivered cash to Senator Estrada at his home or his office.   Some of the cash came from a vault at Napoles's office maintained by Luy.

22

38.   Some kickbacks, such as those paid to GiGi Reyes, Senator Enrile's Chief of Staff, and those paid to Pauline Labayen, Senator Estrada's Deputy Chief of Staff, were delivered to the recipients' homes.

39.   Senator Estrada's bank records reflect cash deposits occurring shortly after cash withdrawals from the accounts of Napoles NGOs.  For example, on April 20, 2010, the Napoles NGO MAMFI withdrew Php 6 million.  Senator Estrada made cash deposits of Php 2 million on April 20, 2010, and Php 4 million on April 21, 2010.

40.   Domestic employees at Napoles's house were ordered to count millions of pesos in cash that Napoles stored at her residence.  As the huge amounts of cash withdrawn from the Napoles NGO accounts accumulated, Napoles faced space constraints.  One of Napoles's maids recalled stacking cash in a bathtub in a Napoles home.

41.   Napoles also caused some funds to be transferred from her NGOs to accounts for other companies she controlled, and paid kickbacks from those accounts.  For example, between September, 2009, and November, 2011, the Napoles NGO SDPFFI transferred Php 123 million (approximately $2.8 million) to accounts Napoles controlled in the names of JLN Corporation, JLN Global Properties Development Corporation, and Jo Christine

Napoles.  As another example, between October, 2010, and June, 2011, MAMFI transferred Php 22.3 million (approximately $500,000) to JLN Corporation accounts.  Kickbacks were then transferred from Napoles company accounts (such as JLN Corporation and Jo-Chris Trading) to at least one of the Senators, Senator Estrada, and to two intermediaries who transferred funds to Senator Estrada.

### b. **Napoles Created Fake NGOs to Receive Government Funds**

42.  According to several former employees, Napoles created "bogus" NGOs that were "dummies" to siphon PDAF funds from the Philippine government.

43.  Napoles used the names of her relatives and employees – including her household workers – as the officers and directors of the Napoles NGOs.  Some individuals were appointed to these positions without their knowledge; in such cases, Napoles had their signatures on the NGO incorporation papers forged.

44.  At Napoles's direction, her former janitor and finance clerk, Marina Sula, assisted in forming some of the Napoles NGOs, including MAMFI.  Napoles instructed her to write down "anybody whom [she] could think of" to serve as NGO incorporators and officers.  Sula made up one name entirely, drew other names from public telephone directories, and included

24

some individuals who were deceased.  Sula also included forged signatures on documents used to incorporate some of the Napoles NGOs.

45.  For SDPFFI, another Napoles NGO, Luy, who served as the NGO's president, listed names of classmates, friends, and fellow churchgoers as SDPFFI's co-incorporators, without their knowledge.  At Napoles's instruction, and without ever notifying the named incorporators, Luy and two other Napoles employees forged the signatures of these individuals on SDPFFI's incorporation papers.

46.  Napoles also caused Nova Kay Batal-Macalintal, her former personal assistant, to be listed as the president of Tanglaw Para Sa Magsasaka, another Napoles NGO, without Nova Kay Batal-Macalintal's knowledge or consent.

47.  Napoles further caused the Napoles NGOs to register false business addresses with the Philippine authorities. Although actually operated from the corporate offices of her JLN Corporation in Pasig City, Philippines, some Napoles NGOs falsely reported that they operated at various residential addresses owned by Janet Napoles or occupied by Napoles's employees, creating the phony appearance of an office as needed.  For instance, in connection with SDPFFI, one of the Napoles NGOs, Luy attested:

The foundation does not really conduct its main
business . . . in the registered business address.  During
accreditation and inspection by the concerned government
agency, we simply furnish and equip the registered
foundation with office supplies and/or equipment and
various documents. . . .  Thereafter, the same is abandoned
and the operation is resumed and carried on at the JLN
Corporation Office.

48.  To control PDAF funds awarded to the Napoles NGOs,
Napoles directed her NGOs to open bank accounts at Philippine
banks, including Metropolitan Bank and Land Bank, and routinely
required the presidents of her NGOs to sign blank bank account
withdrawal slips.  She usually maintained control over the
withdrawal slips, as well as the passbooks, for these NGO
accounts.  In addition, she gave her chauffeur/security
employees Eulogio Rodriguez and John Raymond de Asis authority
to withdraw money from at least one NGO's account, even though
neither Rodriguez nor de Asis had any role in that NGO.

49.  For example, on December 12, 2012, Napoles used a pre-
signed withdrawal slip to withdraw Php 10,000,000
(approximately $225,000) from the Napoles NGO POPDFI's account
at Land Bank – Greenhills Branch.  Napoles authorized her
chauffeur, Eulogio Rodriguez, to make the withdrawal.  On other
occasions, Napoles instructed Suñas, POPDFI's president, to
make withdrawals of Php 10 million, Php 5 million, and Php 25
million and to deliver these funds to Napoles's office.

26

### c. **Napoles Falsified Records of Her NGOs' Completion of PDAF Projects**

50.   The projects proposed and purportedly approved by legislators to be implemented by Napoles's NGOs required, for example, the development and distribution to needy people in various communities of agricultural and livelihood production kits, materials that could be used to grow or make things which could be sold for money, but few production kits were received by the intended beneficiaries.   In fact, many municipal officials were not aware of the existence of the projects in their communities at all.

51.   Prior to 2007, Napoles implemented some of the PDAF projects – although usually charging inflated prices or delivering substandard materials.   By 2007, however, the Napoles NGOs had stopped making deliveries in the awarded projects.   By approximately 2011, facing stricter rules when implementing projects for local governments, Napoles began again to actually implement some of the projects delegated to her NGOs.

52.   To conceal the scheme, the progress reports submitted by the Napoles NGOs to the Philippine government – styled as Reports of Disbursements, Accomplishment Reports, Delivery Reports, Certificates of Acceptance and Inspection, and Lists of Beneficiaries – were fabricated at Napoles's direction.   For instance, although the Napoles NGOs were required to provide

27

documentation identifying each farmer who benefitted from PDAF money, Napoles's employees admitted they were directed by Napoles to create and submit fraudulent acceptance or delivery reports containing forged signatures and inaccurate information.  In some cases, Napoles's NGOs claimed in required reports to the Philippines government that they provided PDAF benefits to individuals who were deceased or did not exist.

53.  According to several former Napoles employees, including Luy and Suñas, even where Napoles's NGOs did implement projects, Napoles's employees would, at her direction, submit reports falsifying the reported costs of materials and project expenses to cover up the kickbacks and pad Napoles's profits.

54.  In another attempt to cover up her wrongdoing, after Luy was rescued from detention in March, 2013, Napoles instructed her employees to start shredding incriminating documents.

C. **Philippine Courts and Law Enforcement Authorities Found Probable Cause that Napoles Violated Philippines Laws in Connection with the PDAF Scam**

55.  On March 28, 2014, the Office of the Ombudsman, the Philippines' anti-corruption authority, issued three joint resolutions containing detailed factual findings (the "Resolutions"), each roughly 120 pages in length, which are

28

predicates to filing criminal charges under Philippine law.  The
Resolutions concluded that probable cause existed to charge
Janet Napoles and over 30 others with plundering state assets
and with violating the Anti-Graft and Corrupt Practices Act.
The Ombudsman concluded that Janet Napoles bribed Senator Enrile
from 2004 until 2010, Senator Estrada from 2004 until 2012, and
Senator Revilla from 2006 until 2010.  According to the
Resolutions, Napoles misappropriated approximately Php 1.14
billion (approximately $26,156,160) from the three Senators'
PDAF between 2007 and 2009 alone.

56.  The Resolutions find that, instead of spending these
funds on public works projects (as the PDAF program was
intended), Napoles paid out 40-60% of the PDAF program funds she
received as kickbacks to officials in exchange for having
millions of dollars' worth of PDAF funds awarded to various NGOs
she controlled.  Napoles diverted most of the remaining funds
from the NGOs for her personal use.

57.  After considering and rejecting Napoles's motion to
the Ombudsman to reconsider the Resolutions, the Ombudsman filed
Informations on June 6, 2014, charging Napoles, several public
officials, including Senators Enrile, Estrada, and Revilla, and
other private individuals, with the Philippine crime of plunder
in connection with the PDAF scam.  These same individuals, along

with other Philippine officials and Napoles's children James and Jo Christine, were also charged with violating the Philippines' Anti-Graft and Corrupt Practices Act.

58.   The Informations filed by the Ombudsman were assigned to three different divisions of the Philippines' anti-corruption court, the Sandiganbayan.   Each of the three divisions of the Sandiganbayan has found that there is evidence establishing probable cause to support the charges against Napoles.

59.   On or about February 5, 2015, the Philippines' Office of the Ombudsman filed charges alleging that Napoles paid bribes to other Philippine officials in connection with the PDAF scam: Samuel Dangwa, Rodolfo Plaza, Constantino Jaraula, and Rizalina Seachon-Lanete, all current or former members of the Philippine Congress.

60.   Similarly, on or about July 1, 2015, the Ombudsman's Office found probable cause to indict Napoles, former Congressmen Ruffy Biazon (later Commissioner of Customs), Rodolfo Valencia, Marc Douglas Cagas, Arrel Olano, and Arthur Pingoy Jr., Zenaida Ducut (later Energy Regulatory Commission Chief), Budget Undersecretary Mario Relampagos, and other officials from the Philippine government agencies National Agribusiness Corp. and Technology Resource Center in connection with the payment and receipt of kickbacks through the PDAF scam.

**D. <u>The Malampaya Fund Scam</u>**

    **a. <u>Overview of the Malampaya Fund Scam</u>**

61.   From in or about July, 2009, through in or about November, 2010, at the same time that she operated the PDAF scam, Napoles stole approximately Php 900 million Philippine pesos (approximately $20.27 million) set aside by the Philippine government to aid farmers affected by two typhoons.  In October, 2013, the Philippines' NBI found sufficient evidence to recommend charging Napoles and others, including a senator and officials of the Philippines' Department of Agrarian Reform (DAR) with plunder, graft, and corruption in connection with the theft of the Php 900 million.

62.   In this scheme, Napoles's NGOs received grants from the Philippines' Malampaya Fund (funded by government royalties from natural gas production), promising to use these public funds for typhoon relief.  At her direction, Napoles's employees created a web of forged documents and paid kickbacks to officials to obtain the money.  In fact, no typhoon relief projects ever took place.

63.   The funds were authorized to be used to address the devastating aftermath of tropical cyclones Ondoy and Pepeng, which struck the Philippines in rapid succession in September 2009.  At the time, these were the two costliest tropical

cyclones in the history of the Philippines.  More than one thousand people died, and over 200,000 houses were damaged. Damage to agriculture was estimated at Php 27.2 billion (approximately $612.6 million).  On October 8, 2009, government officials approved the use of the Malampaya Fund for relief works and services for areas affected by natural disasters.

64.   As with the PDAF scam, Napoles used NGOs she controlled to apply for and obtain government contracts financed by DAR's allotment from the Malampaya Fund.  The NGOs' presidents were JLN employees, Napoles household employees or relatives.  The NGOs used included Gintong Pangkabuhayan Foundation, Inc., of which Eulogio Rodriguez, a chauffeur for Napoles, was president.

65.   Napoles did not deliver the promised typhoon relief projects as required.  Instead, virtually all of the funds appear to have been used to benefit Napoles personally and to make corrupt payments to Philippine public officials.

**b. Napoles Directed the Submissions of Fraudulent Applications to Provide Typhoon Relief**

66.   After the typhoons hit the Philippines, Napoles directed certain JLN Corporation employees to fabricate letters from local mayors requesting disaster assistance from the Malampaya Fund.  In drafting these fraudulent letters, Napoles

employees copied letters previously submitted to the DAR relating to other projects.

67.  JLN employees also fabricated fraudulent "Memoranda of Agreement" (MOAs) between various NGOs controlled by Napoles, local governmental units in the Philippines, and the Philippine Department of Agrarian Reform, agreeing to provide agricultural relief to affected farmers.  In drafting these documents, JLN employees forged the signatures of local mayors without their knowledge or consent.  Using these fraudulent MOAs, Philippine government officials issued approximately 97 checks to the Napoles-controlled NGOs.

68.  The DAR's awards of money from the Malampaya Fund to the Napoles NGOs violated numerous Philippine procurement rules. For example, the Napoles-controlled NGOs were selected without public bidding.  As another example, DAR officials kept releasing money to the Napoles NGOs without receiving documents showing that the NGOs had used the money they had already received or accomplished any of the project objectives.

69.  More fundamentally, none of the Malampaya Fund projects were earmarked to be implemented by NGOs – so the government officials never should have awarded contracts with the Napoles NGOs in the first place.

33

### c. **Napoles Stole Approximately $20 Million Intended for Typhoon Relief**

70.     As in the PDAF scam, Napoles maintained control over the bank account passbooks and pre-signed withdrawal slips for the NGOs that received money from the Malampaya Fund.  After public funds were deposited in various NGO accounts she controlled, Napoles had the funds withdrawn for her personal use.

71.     At her direction, money was withdrawn in cash from these NGO accounts and delivered to Napoles's residence or her office before being deposited into Napoles's personal and business bank accounts.

72.     Napoles received approximately Php 900 million from the Malampaya Fund (approximately $20.27 million) in 2009 through her NGOs.  Out of the Php 900 million awarded, Napoles paid approximately Php 337,775,000 in kickbacks to public officials as follows (approximately $7.61 million):

**TABLE 3 – Malampaya Fund Kickbacks Paid by Napoles**

| Kickback (Php) | Approx USD Equivalent | Recipient | Official Position |
|---|---|---|---|
| 75,000,000 | $1,689,190 | Nasser Pangandaman | Secretary for Agrarian Reform |
| 14,000,000 | $315,315 | Teresita Panlilio | Department Finance Official |
| 6,000,000 | $135,135 | Narciso Nieto | Undersecretary for Agrarian Reform |

34

| 242,775,000 | $5,467,905 | Ruby Tuason | Assistant to Senator Estrada |

73.   To conceal the theft, Napoles's employees, acting at her direction, prepared and submitted to the government false fund utilization and liquidation reports.  In these reports, Napoles employees represented falsely that the relevant NGOs had delivered disaster assistance to affected communities.  They also again forged the signatures of mayors whose communities were supposed to have received assistance from the Napoles NGOs. Napoles herself forged some of the signatures on these documents.

74.   Napoles's employees also fabricated the names of farmers who benefitted from the assistance of Napoles's NGOs. One name identified as a local farmer and beneficiary was actually that of an associate justice of the Philippine Supreme Court, who is not also a farmer eligible to receive these benefits.

**E. The Fertilizer Fund Scam**

75.   In 2004, the same year the PDAF scam began, Napoles used NGOs and trading companies she controlled (called Jo-Chris Trading and TNU Trading) to obtain government funding allocated to fertilizer delivery to eligible Philippine farmers.  In exchange for awards of contracts from regional offices of the

Department of Agrarian Reform to these entities, Napoles paid kickbacks to members of Congress and to local mayors.

76. At all relevant times, the Ginintuang Masaganang Ani ("GMA") was a program sponsored by the Philippine Department of Agriculture under which the Philippine government provided assistance and support to the country's agricultural and fisheries industries. On or about February 3, 2004, the Department of Management and Budget issued Special Allotment Release Order No. E-04-00164 for the funding of Php 728 million (approximately $16,396,396) worth of GMA farm inputs, including fertilizers.

77. These funds were distributed to the Department of Agriculture's Regional Field Units ("RFUs"). Members of Congress and local public officials could direct the RFUs in their regions to purchase fertilizers from certain suppliers. Napoles agreed to and did pay members of Congress up to Php 5 million (approximately $112,600) each and mayors up to Php 2.5 million (approximately $56,300) each, in return for which these officials directed RFUs to purchase fertilizers from Napoles's trading companies at inflated prices.

78. Government officials who benefitted from this scheme included, among others, Congressman C.E. from District 6, Pangasinan; Congressman M.O. from District 1, La Union;

Congressman A.C. from District 1, Pangasinan; Mayor E.T. of Umingan, Pangasinan; Mayor A.J. of Dasol, Pangasinan; and Mayor R.R. of Rosales, Pangasinan.

79.   For example, in April and May 2004, the RFU for Region I purchased from Jo-Chris Trading approximately 11,873 units of foliar fertilizers (at 300 ml each) for the per unit price of Php 800.   However, a subsequent survey of prices by the Philippine Commission on Audit determined the fair market price of each unit was approximately Php 165.   The Commission determined that Jo-Chris Trading overcharged the RFU roughly Php 7,539,355 (approximately $169,800).

80.   Similarly, on or about April 2004, the RFU for Region XI purchased from TNU Trading approximately 4,063 units of fertilizer at Php 800 per unit.   On or about August 18, 2004, the same RFU purchased approximately 2,188 units of fertilizer at the same price.   The Commission on Audit determined that the local fair market price was only Php 120 and that TNU Trading overcharged the RFU roughly Php 4,250,680 (approximately $95,736).

81.   In other instances, the RFUs did not directly purchase fertilizer but, instead, further distributed the GMA funds to NGOs, including at least three created and controlled by Napoles:  POPDFI, PSDFI, and MAMFI.   Like Jo-Chris Trading and

37

TNU Trading, these NGOs charged the government Php 800 for each unit of fertilizer procured, despite the Commission on Audit's findings that fair market prices ranged from Php 91 to Php 134. The Commission estimates that POPDFI, PSDFI, and MAMFI overcharged the government by approximately Php 36,564,157.50 (approximately $823,500).

82.   Not only did Napoles overcharge the government for fertilizer purchased through trading companies and NGOs controlled by her, but the fertilizer delivered was often counterfeit or adulterated, further increasing her unlawful gain and the damage to the Philippines.   These illicit proceeds funded the improper kickbacks to government officials and her own illegal profits.

**F. Napoles Does Not Have Legitimate Income Sufficient to Account for Her Tens of Millions of Dollars in Purchases and Expenditures**

83.   During the relevant period, Napoles and her family had insignificant sources of income not traceable to her illegal activity – far less than the amounts involved in the purchases of the defendant properties.

84.   In total, Napoles funded at least $12 million in property purchases in the United States between 2006 and 2012 – in addition to the numerous properties she acquired and held in the Philippines at the same time.

38

85.    During a single ten-month period, from September 2006 to July 2007, Napoles paid about $4.85 million for down payments and mortgage payments for the Anaheim Motel, Covina Real Property, and Irvine House.

86.    In addition, less than two and a half years after she provided $4.85 million for the down payments for the Defendant Real Properties, Napoles paid over $5 million dollars to pay off the mortgages on the three Defendant Real Properties.  By the end of October, 2009, the $3.5 million mortgage for the Anaheim Motel, the $960,000 mortgage for the Covina Real Property, and the $875,000 mortgage for the Irvine House had been paid in full.  Less than two years later, in 2011, Napoles bought the $1.28 million Ritz-Carlton Residence, and, in 2011-2012, she invested another $1 million in Solution Strategies, a California consulting business.

87.    In addition to the defendant properties named in this complaint, Napoles acquired approximately 40 properties in the Philippines during the period of the PDAF scam.

88.    Napoles's former employees, including employees who handled her finances, have confirmed that Napoles's only source of income, at all times relevant to the complaint, was government contracts.

89.   Napoles's husband, Jaime, is a retired naval officer, who did not earn any substantial separate, legitimate income. As described below, he failed to report income and pay taxes in most of the years of the scams.

90.   Before she started the PDAF scam in 2004, Napoles operated a barber shop and butcher shop from a naval base in the Philippines, but these small businesses had few customers and generated little revenue.

91.   Between 2004 and 2012, while acquiring millions of dollars' worth of properties, Napoles and her husband declared a total of less than $7,000 worth of income in the Philippines.

92.   Based on their substantial purchases in the Philippines during the period of the PDAF scam, Napoles and her husband have been charged in the Philippines with failing to pay over Php 60 million in taxes (approximately $1.35 million).

93.   Shortly before surrendering to Philippine authorities, Napoles asked the two principal owners of Solution Strategies to tell the Philippine media that she had made money from Solution Strategies' legitimate business operations.  Because Napoles in fact made no money from Solution Strategies, the company's principal owners declined to do so.

94.   Following Solution Strategies' refusal to lie about Napoles's earnings, Napoles next falsely claimed to Philippine

media representatives that she earned her money from the coal
business.  This claim is false.  Napoles did not incorporate any
coal companies until 2010 – well into the PDAF scam – and they
earned minimal, if any, profits.

95.  Napoles in fact earned little legitimate income from
any company during the period of the PDAF scam.  From 1997 to
2013, approximately 24 companies were incorporated in the
Philippines by Napoles, her husband Jaime, or her children James
and Jo Christine.  Twelve shared the same address.  As of 2012,
only half were still operational, and only three had complied
with the Philippines' Security and Exchange Commission's
requirement to file annual financial statements: RLG Solutions
Corp., a "security systems and IT" company formed February 15,
2012; JCLN Global Properties Development Corp., a real estate
company formed June 3, 2005; and JLN Corporation, a "marine
supplies and equipment" company, formed April 27, 1999.

96.  The combined income reported from these companies
during the eight-year run of the PDAF scam did not even exceed
$100,000.  In 2012, RLG declared zero revenue and Php 383,340.94
in losses (about $8,630).  Between 2006 and 2012, JCLN Global
Properties declared annual net incomes of between Php 69,839.99
and Php 544,699.30 (about $1,573-$12,268).  From 2004 to 2011,

41

JLN Corporation declared annual net incomes of between Php 21,085.82 and Php 100,395.48 ($470-$2,260).

97.   Even if they had legitimate income, Napoles's companies did not have sufficient assets to fund millions of dollars in purchases by Napoles.  Prior to 2007, JLN Corporation had less than Php 20 million in assets – under $500,000.  Between 2007 and 2011, the level of assets climbed, but only to Php 28.67 million – less than $650,000.  Before 2012, JCLN Global Properties' asset levels stayed at Php 21.04 million or below – again, less than $500,000.

**G. Laundering the Stolen Funds from the Philippines to the United States**

98.   During the period from at least in or about 2006 to in or about 2012, Napoles and her associates laundered more than $12 million in criminal proceeds into the United States, often using foreign currency exchangers to wire funds out of the Philippines to family members and corporate entities formed in the United States, who held assets.  The family members and corporate entities who received the wires often then transferred funds between multiple accounts.

**a. Napoles Used Money Remitters, Such as Key West Trading and Edzen Enterprises, to Send Criminal Proceeds to the United States**

99.   As set forth above, in most cases, Napoles caused her NGOs and businesses to withdraw the proceeds of her fraudulent

42

schemes from her NGOs' and business accounts in cash.  A portion of those funds were used to pay kickbacks to government officials, while other monies were transported to her office or her home, deposited into accounts under her control, or transferred to the United States or elsewhere.

100.  To move the proceeds of her scams to the United States, Napoles relied primarily on money changers to convert Philippine pesos into U.S. dollars and send the dollars to the United States.  The most common money changers and remitters Napoles used to send criminal proceeds to the United States were Key West Trading, operated by Hector Ang, and Edzen Enterprises, operated by Stephen Teung.  Other remitters she used included Michael Ty and Esquire International Financing Corporation.

101.  To send dollars to the United States, Napoles or one of her agents or entities would deposit pesos in cash into an account controlled by the money remitter.  After receiving funds from Napoles, the money remitter wired the dollar equivalent of the peso deposit into the United States to an account designated by Napoles or persons acting at her direction.

102.  Financial records and records of Napoles's former finance officer demonstrate Napoles's use of wire remitters to transfer criminal proceeds to the United States to purchase the defendant properties.  For example, on September 21, 2006,

43

Hector Ang converted Php 25,180,000 in PDAF funds into USD $500,000. On September 22, 2006, Ang's company Key West Trading wired USD $499,975 into a U.S. bank account at Hanmi Bank in the name of the Napoles family company Western Investment. As set forth below in Table 5, Western Investment, in turn, used this money to fund part of the down payment for the purchase of the Anaheim Motel.

103. Napoles also used these wire remitters to pay off the mortgage for the Anaheim Motel with the proceeds of her crimes. For example, on September 4, 2009, the Napoles NGO SDPFFI received a check for Php 20 million in PDAF funds from the Philippine government agency NLDC. On September 10, 2009, a second Napoles NGO, AEPFFI, received another PDAF check from NLDC for Php 22,500,000. On September 14, 2009, SDPFFI transferred Php 1,750,000 to the money changer, Hector Ang, and AEPFFI transferred an additional Php 22,500,000 to Ang. Ang converted these transfers to USD $500,000. As set forth below in Table 6, that same day, Ang's company, Key West Trading, wired approximately USD $499,980 to Hanmi Bank to pay off part of the mortgage on the Anaheim Motel.

104. As another example, on September 10, 2009, a Napoles NGO, MAMFI, received Php 20 million in PDAF funds from NLDC. On September 14, 2009, MAMFI gave Php 19,400,000 to Stephen Teung

44

of Edzen Enterprises, who converted it to USD $400,000.  As

further enumerated in Table 6 below, on September 14, 2009,

Edzen Enterprises transferred approximately USD $399,978 to

Hanmi Bank, also to pay off part of the mortgage on the Anaheim

Motel.

105.  Napoles used the same methods and money remitters to

move funds to the United States to acquire other defendant

assets.  For example, on April 24, 2007, checks from the

Philippine government totaling Php 24 million were deposited in

the account of Napoles NGO AEPFFI.  On April 26, 2007, Hector

Ang converted Php 4,765,000 of PDAF proceeds to generate USD

$100,000.  On April 27, 2007, Key West Trading wired USD $99,980

into a Bank of America account (account number ending 3382) in

Reynald Lim's name.  As alleged below, Lim then funneled the

money through two additional bank accounts in the United States

before using it toward the down payment for the Irvine House.

106.  Similarly, on May 24, 2007, Hector Ang converted Php

23,251,000 in PDAF proceeds to generate USD $503,159.  On May

29, 2007, Ang's company Key West wired approximately USD

$199,975 to an account in the name of Western Ventures

Management at Hanmi Bank (account number ending 0829).  This

transfer was comingled with other stolen funds to fund the down

payment for the purchase of the Covina Real Property.  As

45

alleged below, on June 8, 2007, Western Ventures Management
wrote a $422,807.99 check from the same Hanmi account (account
number ending 0829) to fund the down payment for that property.

107.  On March 25, 2014, the Philippines' Anti-Money
Laundering Council issued an Asset Preservation Order freezing
accounts in Edzen Enterprises' and Hector Ang's names (along
with an account in the name of another wire remitter used by
Napoles, Michael Ty) based on a finding of probable cause that
the accounts were related to acts of plunder or bribery.

108.  While Napoles most commonly used money remitters to
transfer criminal proceeds into the United States, she also
occasionally sent some of her criminal proceeds to the United
States directly from accounts in her own name.  For example, on
May 28, 2008, she converted Php 2,628,000 into U.S. dollars
through Metropolitan Bank in the Philippines, generating USD
$60,000.  She then sent USD $49,980 on June 2, 2008, from
Metropolitan Bank in the Philippines to a Wells Fargo bank
account in the United States, held in the name of Western
Investment, a company controlled by her family.

   b. **Napoles Sent Criminal Proceeds to U.S. Accounts in
      Others' Names**

109.  Many U.S. bank accounts designated by Napoles to
receive her criminal proceeds were held in the names of Napoles
family members.  They included a Wells Fargo account in the name

of Jo Christine Napoles, a Bank of America account in Reynald Lim's name, a Wells Fargo account in the name of Napoles's nephew Jose Emmanuel Lim, and an account in Jeane Napoles's name at Union Bank.

110.  Napoles also directed numerous transfers of criminal proceeds (often through money remitters such as Key West and Edzen Enterprises) to two corporations she controlled through her family members, Western Investment and Western Ventures Management, or to accounts in the name of property they owned, such as the Anaheim Motel.

111.  Both Western Ventures Management and Western Investment were incorporated in California in 2006, shortly before Napoles began to acquire the Anaheim Motel and Covina Real Property.

112.  At all times relevant to the complaint, members of Napoles's family have been officers and directors of Western Investment.  At all times relevant to this complaint, Napoles's brother Reynald Lim was the registered agent for Western Investment and named as its Chief Financial Officer.  Napoles's daughter Jo Christine, also charged in the Philippines in connection with the PDAF scam, was the company's president. Western Investment's only known asset is the Anaheim Motel.

47

113.   Western Ventures Management is also a Napoles family company.  Until sometime in 2014, Reynald Lim was the registered agent for the company, as well as a Vice President and a Director, and Napoles's son James, also charged in the Philippines in connection with the PDAF scam, was the president.  Jo Christine Napoles was listed as the secretary; she was later succeeded by James Napoles.

114.   To conceal her connection to her investments in the United States using stolen funds, Janet Napoles's name does not appear on any of the incorporation documents or the documents registered with the State of California as an officer, director, shareholders or employee.  Nor is she a signatory on the corporations' bank accounts.

115.   While not officially associated with the businesses, Napoles provided the funding for and made the significant economic decisions involving the Western Investment and Western Ventures Management companies.

116.   Napoles was also responsible for hiring Solution Strategies to perform consulting services for the two properties owned by Western Ventures Management and Western Investment, the Anaheim Motel and the Covina Real Property.

117.   Indeed, Napoles has confirmed publicly on at least one occasion that she and her family own the Anaheim Motel, and

48

also presented herself to certain business associates (the owners of Solution Strategies) as the owner of the properties.

**H. The Purchase of the Defendant Properties with Criminal Proceeds**

118. Napoles used at least approximately $12 million of her criminal proceeds to invest and pay expenses associated with her family in the United States.

**a. The Purchase of Anaheim Motel With the Proceeds of Napoles's Scams**

119. The Anaheim Motel was purchased by Western Investment, the Napoles family-controlled company, on September 25, 2006, for $7 million, including a $3.55 million down payment and a $3.5 million mortgage from Hamni Bank. The deed transferring title to Western Investment was recorded on December 6, 2006. Western Investment paid off the mortgage on December 4, 2009.

120. Located near Disneyland, the Anaheim Motel was previously operated as a Days Inn during part of the period relevant to the complaint. It is currently operated as the Anaheim Express Inn.

121. As detailed below, nearly all of the funds used for the down payment and to pay the motel's mortgage are traceable to Napoles, either directly or through accounts in the names of members of her family who had insufficient independent funds to

49

make the payments.  Millions of dollars came from Key West Trading and Edzen Enterprises, the money remitters that Napoles used to launder the money she stole from the Philippine government.

### i. The Down Payment for the Anaheim Motel Was Funded With Napoles's Criminal Proceeds

122.  Between approximately September 22 and December 4, 2006, accounts in the name of Western Investment received at least $3,499,843.40 in wires from persons and entities linked to Napoles and the wire remitters she used to transfer funds from the Philippines, including Key West Trading, Janet Napoles, JC Holdings, and Reynald Lim.  These funds were used to make the down payment to purchase the Anaheim Motel.

123.  Described in the chart below, Western Investment received approximately $2.3 million of the $3.55 million down payment for the Anaheim Motel from Key West Trading, one of the principal wire remitters Napoles used to transfer criminal proceeds abroad, into its account ending in 0837 at Hamni Bank ("Western Investment Corp. Hanmi Account 0837"):

**TABLE 4 – Wire Transfers of Stolen Funds to Western Investment Hanmi Account 0837**

| Date | Origin of Wire Transfer | Amount |
|------|-------------------------|--------|
| 9/22/2006 | Key West Trading, Rizal Commercial Bank (Philippines) | $499,975 |

| 10/2/2006 | Key West Trading, Banco de Oro Universal Bank (Philippines) | $299,980 |
|---|---|---|
| 10/3/2006 | Key West Trading, Rizal Commercial Bank (Philippines) | $499,975 |
| 10/3/2006 | Key West Trading, Banco de Oro Universal Bank (Philippines) | $499,980 |
| 10/5/2006 | Key West Trading, Rizal Commercial Bank (Philippines) | $499,975 |
| TOTAL | | $2,299,884.00 |

124.  At least approximately $1,099,965 of the remaining $1.25 million used for the down payment is also traceable to Napoles. Specifically:

(i)  On October 6, 2006, an account in Janet Napoles's name at United Coconut Planters' Bank in the Philippines sent a wire to Western Investment Corp. Hanmi Account 0837 for $599,970.

(ii) On October 30, 2006, a company named JC Holdings wired $499,995 from Metropolitan Bank to Western Investment Corporation's Hanmi Account.  Several of Napoles's children have the initials "JC" – Jo Christine, James Christopher, or Jeane Catherine.[4]

---

[4] Napoles named several companies using family initials, including JLN Corporation and JCLN Global Properties Development Corporation.

51

(iii)    Napoles's brother Reynald Lim (who later helped detain Benhur Luy) also wired $99,995 into the Western Investment Corp. Hanmi Account 0837 on December 4, 2006.  Despite living in California in 2006, Lim had zero wages for 2005 or 2006, according to the California Employment Development Department.  Lim's only sources of income at the time were his wife's modest salary as a nurse and money he received through his sister's fraud and corruption.

125.  After receiving these funds, Western Investment used checks drawn on two Hanmi Bank accounts and signed by Jo Christine Napoles, who was 22 years old at the time, to make the $3.55 million down payment to purchase the Anaheim Motel via an escrow company called Best Escrow.

126.  As summarized below, three transactions totaling $3,055,000 of this down payment were paid from Western Investment's Hanmi Account 0837.  In addition, on November 1, 2006, Western Investments transferred $500,000 from its Hanmi Account 0837 to a second account in the name of Western Investment at Hanmi Bank with an account number ending in 1329, which paid the remaining $500,000 toward the down payment for the Anaheim Motel about one month later:

**TABLE 5 – Checks Used to Purchase Anaheim Motel**

| Date | Amount | Hanmi Account Source | Payee | Memo on Check |
|------|--------|---------------------|-------|---------------|
| 9/25/06 | $100,000 | Western Investment Hanmi Account 0837 | Best Escrow | "DEPOSIT FOR ESCROW" |
| 12/4/06 | $2,900,000 | Western Investment Hanmi Account 0837 | CASH | "BEST ESCROW – DOWNPAYMENT" |
| 12/4/06 | $55,000 | Western Investment Hanmi Account 0837 | CASH | "BEST ESCROW – DOWNPAYMENT" |
| 12/4/06 | $500,000 | Western Investment Hanmi Account 1329 | CASH | "BEST ESCROW – DOWNPAYMENT" |

### ii. Mortgage Payments for the Anaheim Motel Were Funded with the Napoles's Criminal Proceeds

127.  By December 4, 2009, Western Investment had also used Janet Napoles's criminal proceeds to pay off the $3.5 million mortgage it had obtained just three years earlier from Hanmi Bank for the balance of the purchase price of the Anaheim Motel.

128.  U.S. bank accounts not in Napoles's name received numerous transfers from the money changers Key West Trading, Edzen Enterprises, and Michael Ty in the Philippines, and then used the funds to pay off the mortgage.  As alleged in paragraphs 93-102 above, Napoles often used these money remitters to convert the funds she received from the Philippine

53

government into U.S. dollars and send the funds to the United States. The U.S. bank accounts to which Napoles funneled her criminal proceeds received additional transfers from Napoles's Philippine bank accounts, during a period in which she had no significant legitimate sources of income, as also alleged above.

129. Between April, 2007, and August, 2009, over $3 million was transferred from Napoles accounts in the Philippines or through money changers Key West Trading, Edzen Enterprises, and Michael Ty to accounts controlled by Napoles and her associates in the United States. These accounts included a Hanmi account in the name of Western Ventures Management, Inc. DBA Days Inn Maingate/Convention Center ("Western Ventures Management Hanmi 0829 Account"); an account in the name of Western Ventures Management dba Days Inn (the "Days Inn 9788 Wells Fargo Account"); a Wells Fargo account in the name of Western Investment Corp., dba Days Inn (the "Days Inn 4107 Wells Fargo Account"); an account in the name of Western Ventures Management at Hanmi Bank, account number ending 1261, and a Wells Fargo account in the name of Anaheim Luxury Suites.

130. The $3 million transferred from the Philippines funded approximately $825,000 in mortgage payments made roughly once a month between June 5, 2007, and September 2, 2009. On occasion, the accounts receiving transfers from the Philippines

54

transferred funds to other accounts in the names of Western Ventures Management or the Days Inn, which then made the mortgage payments.

131.   After making fairly regular mortgage payments between June 2007 and September 2, 2009, Western Investment quickly paid off the balance of the mortgage between September 14, 2009, and October 8, 2009.   During this three-week period, over $3 million, mostly wire transfers from Key West Trading and Edzen Enterprises in the Philippines, went directly to Hanmi Bank, the mortgage holder:

**TABLE 6 – Stolen Funds Used to Pay Off Remaining Balance on Anaheim Motel Mortgage**

| Date | Type | Origin | Amount |
|------|------|--------|--------|
| 9/14/2009 | Wire | Key West Trading, Banco de Oro Universal Bank(Philippines) | $499,980 |
| 9/14/2009 | Wire | Edzen Enterprises, Rizal Commercial Bank(Philippines) | $399,978 |
| 9/16/2009 | Wire | Days Inn 4107 Wells Fargo Account | $900,000 |
| 10/7/2009 | Wire | Edzen Enterprises, Rizal Commercial Bank (Philippines) | $499,978 |
| 10/8/2009 | Wire | Key West Trading, Banco de Oro Universal Bank (Philippines) | $799,980 |
| TOTAL | | | $3,099,916 |

132.   Before making the $900,000 wire transfer to Hanmi Bank on September 16, 2009, the Days Inn 4107 Wells Fargo

55

account had received approximately $1.4 million worth of transfers, nearly all from Napoles's accounts, Key West Trading (directly and via a Western Ventures Management Wells Fargo account), and Edzen Enterprises accounts in the Philippines. Specifically, the Days Inn 4107 Wells Fargo account received wires including $39,975 from Jo Christine Napoles (Metropolitan Bank, Philippines) on July 8, 2009; $299,975 from Janet Lim Napoles (Metropolitan Bank, Philippines) on August 4, 2009; $499,980 from Key West Trading (Banco de Oro Universal Bank, Philippines) on September 11, 2009; $400,000 from Janet Napoles (HSBC Manila, Philippines) on September 11, 2009; $109,973 from Janet Napoles or Jo Christine Napoles (Metropolitan Bank, Manila) on September 17, 2009; and $49,975 from Janet Napoles (Metropolitan Bank, Manila) on September 17, 2009.[5]

133.  In summary, Napoles, both directly and through Edzen Enterprises and Key West Trading, sent several million dollars to the United States to purchase the Anaheim Motel. Specifically, $3.5 million of the down payment and over $3.8 million in mortgage payments are traceable to the proceeds of Napoles's scams.

---

[5] This $299,975 that the Days Inn 4107 Wells Fargo Account received from Janet Lim Napoles (Metropolitan Bank, Philippines) on August 4, 2009, is included in the approximately $3 million in transfers received between April 2007 and August 2009, which was used to make the $825,000 in roughly monthly mortgage payments.

### b. The Covina Real Property Was Purchased with Napoles's Criminal Proceeds

134.   In early June 2007, Napoles purchased the Covina Real Property (including the pre-school/day care business) for $1.4 million, broken down into $1.2 million for the property and $200,000 for the business.  Western Ventures Management made $440,000 in down payments and received two loans from Hanmi Bank for the remainder of the purchase price ($960,000) on June 8, 2007.  On June 15, 2007, a deed was recorded granting the Covina Real Property to Western Ventures Management.  These loans were fully paid off by the end of October, 2009.

135.   As of the filing of this First Amended Complaint, no school or day care was in operation.

136.   As set forth below, the Covina Real Property was purchased with the proceeds of and was involved in laundering the money that Napoles stole from the Philippines.  Nearly all of the down payment for this property is traceable to wires that Western Ventures Management received from Key West Trading, and thus, to the proceeds of Napoles's scams.  Many mortgage payments are similarly traceable to Key West, Edzen Enterprises, and Janet Napoles's Philippine funds.

137.   Despite a lack of legitimate income, Napoles made the $440,000 down payment for the Covina Real Property just months after paying $3.55 million in down payments for the Anaheim

Motel.  Similarly, Napoles and her associates paid off the $960,000 loans on the Covina Real Property at the same time that she paid off the $3.5 million mortgage for the Anaheim Motel.

138.  After Napoles lost access to government funds and surrendered to Philippine authorities in August, 2013, the Napoles family began to try to obtain money from the Covina Real Property by selling or mortgaging it.

139.  In December, 2014, Western Ventures Management took out a $267,000 mortgage on the Covina Real Property.  On April 21, 2015, a notice was filed indicating that Western Ventures Management had defaulted on the loan.

**i. The Down Payment for the Covina Real Property Was Funded By the Proceeds of Napoles's Scams**

140.  Between November, 2006, and June, 2007, Western Ventures Management made three payments totaling $464,807.99 to New Century Escrow, which covered a $440,000 down payment for the Covina Real Property and school business.

141.  On November 17, 2006, Western Ventures Management wrote two checks from the Western Ventures Management Hanmi 0829 Account to New Century Escrow: one for $2,000 with a memo stating "school business," and a second for $40,000, with a memo stating "school property."  The Western Ventures Management Hanmi 0829 Account made a third payment on June 8, 2007, writing

a check for $422,807.99 to cash, with a memo stating that the funds were for New Century Escrow Cumorah Academy.

142.   In total, between October, 2006, and May, 2007, the Western Ventures Management Hanmi 0829 Account received $964,870.50 from sources traceable to Napoles's scams, such as Key West, the money remitter Michael Ty, and Reynald Lim, who provided $100,000 despite having no reported wages for 2006. These funds were used for the Covina Real Property down payment and other investments. Specifically, the Western Ventures Management Hanmi 0829 Account  received the following transfers:

**TABLE 7 – Deposits of Stolen Funds into Western Ventures Management Hanmi 0829 Account**

| Date | Type | Origin | Amount |
|------|------|--------|--------|
| 10/3/2006 | Wire | Key West Trading, Banco de Oro Universal Bank (Philippines) | $19,975.00 |
| 11/3/2006 | Wire | Key West Trading, Banco de Oro Universal Bank (Philippines) | $9,979.50 |
| 11/6/2006 | Check | Reynald Lim, Bank of America | $100,000 |
| 12/4/2006 | Check | Western Investment Corporation, Hanmi Bank 0837 | $35,000 |
| 4/3/2007 | Wire | Michael Ty (Philippines) | $99,966 |
| 4/11/2007 | Wire | Key West Trading, Banco de Oro Universal Bank (Philippines) | $499,975 |

| 5/29/2007 | Wire | Key West Trading, Banco de Oro Universal Bank (Philippines) | $199,975 |
|-----------|------|------------------------------------------------------------|----------|
| TOTAL | | | $964,870.50 |

### ii. Napoles's Criminal Proceeds Also Funded Mortgage Payments for the Covina Real Property

143. Between approximately June 2007 and October 2009, Western Ventures Management paid off two loans from Hanmi Bank, one for $840,000 and one for $120,000, it had obtained in connection with its purchase of the Covina Real Property and the business of Cumorah Academy, respectively.

144. Western Ventures Management made $174,214.07 in monthly mortgage payments between September 2007 and September 2009 before paying off the loans. At least $128,365.25 of the $174,214.07 mortgage payments are traceable to one of two sources.

145. First, most of the $128,365.25 is traceable to transfers from the Philippines, sent from accounts in the names of Key West Trading, Edzen Enterprises, and Napoles herself, and funneled through the Days Inn 4107 Wells Fargo Account. The Days Inn 4107 Wells Fargo Account issued fourteen checks to an account in the name of Western Ventures Management, totaling $143,432.77, some of which was used to make mortgage payments on the Covina Real Property.

146. Second, Western Ventures Management also used income from its purchase of the Covina Real Property with criminal proceeds to further pay down the mortgage on the property. Specifically, mortgage payments are traceable to the proceeds of the school/day-care business operated out of the Covina Real Property. For example, Western Ventures Management made eight monthly payments between November 8, 2007, and June 8, 2008, from a Wells Fargo Bank account in the name of Western Ventures Management dba Cumorah Academy, totaling $49,417.63. During this time period, the Wells Fargo Bank account in the name of Western Ventures Management dba Cumorah Academy received more than this amount in tuition payments.

### c. **The Purchase of Irvine House with Napoles's Criminal Proceeds**

147. On July 18, 2007, Reynald Lim and his wife, Ana Marie Lim, acquired the title to the Irvine House as joint tenants. The purchase price was $1.4 million. On March 31, 2015 – after Reynald had become a fugitive from Philippine kidnapping charges – a grant deed was filed with Orange County, vesting title to the Irvine House solely in Ana Marie Lim.

148. The Irvine House was purchased in June 2007 with a payment of $618,200 to Pickford Escrow Company and the proceeds of an $875,000 mortgage the Lims obtained. The mortgage was paid off in just over two years, by October 26, 2009.

61

149.  As alleged below, the proceeds of Napoles's scams – mostly in the form of wires from Key West Trading in the Philippines – funded the purchase of the Irvine House.

### i. The Down Payment for the Irvine House was Made with Napoles's Criminal Proceeds

150.  Napoles provided approximately $618,000 for a down payment for the purchase of the $1.4 million Irvine House, in a series of transactions intended to conceal the source of the funds.

151.  Using Napoles's criminal proceeds, Reynald Lim made two payments to Pickford Escrow Company as a down payment for the purchase of the Irvine House: a $42,000 payment, and a $576,200 payment.

152.  Lim made the $42,000 payment on June 4, 2007, with a check from a Bank of America account in his name (the "Lim 3383 Bank of America Account") to Pickford Escrow Company.  Of the $42,000, $30,000 of the proceeds are traceable to a $99,980 wire transfer from Key West, sent via another Bank of America Account in Lim's name (the "Lim 3382 Bank of America Account.")

153.  On July 16, 2007, Lim wrote a second check to Pickford Escrow Company toward the down payment, this time for $576,200, from a Hanmi Bank account in the name of Reynald and Ana Marie Lim (the "Reynald and Ana Marie Lim Hanmi Account").

154.   The $576,200 check is traceable to funds received from Key West Trading, the principal wire remitter used by Napoles to send her criminal proceeds to the United States, on April 27, 2007; May 29, 2007; July 12, 2007; and July 13, 2007. Key West Trading's remittances were then transferred via Lim's accounts at Bank of America and the Western Ventures Management Hanmi 0829 Account.  The specific tracing is as follows:



155.   To summarize the chart above, the Reynald and Ana Marie Lim Hanmi Account, which made a $576,000 down payment for the Irvine House, received $569,000 in funds traceable to Key West Trading ($50,000 net from transfers from Lim's Bank of America accounts and $519,000 from the transfers to the Western Ventures Management Hanmi 0829 Account).   The Reynald and Ana Marie Lim Hanmi Account received those funds between June 22 and July 16, 2007.

### ii. Mortgage Payments for the Irvine House Were Made with Napoles's Criminal Proceeds

156.   Between August 30, 2007 and October 8, 2009, Reynald Lim made twenty-six monthly mortgage payments of $4,990.72 each from the Lim 3383 Bank of America Account ($129,758.72 in total).

157.   The $129,758.72 in mortgage payments from the Lim 3383 Bank of America Account are traceable to several sources, including the Lim 3382 Bank of America Account, Key West Trading, the Days Inn 4107 Wells Fargo Account, and the Days Inn 9788 Wells Fargo Account.

158.   The transfers from the Lim 3382 Bank of America Account, the Days Inn 4107 Wells Fargo Account, and the Days Inn 9788 Wells Fargo Account are in turn largely traceable to the

64

money remitters Napoles used to launder the proceeds of her scheme, such as Key West, and Napoles's Philippine accounts:

    (i)  The Lim 3382 account received $476,918 from Key West Trading between April 27, 2007, and October 1, 2007; between May 1, 2007, and October 15, 2007, it transferred $420,500 to the Lim 3383 Bank of America Account;

    (ii) The Days Inn 9788 Wells Fargo account received $769,860 from Key West Trading between October 17, 2007, and March 25, 2008.  It wrote checks totaling $420,000 to the Lim 3383 Bank of America Account between October 27, 2007, and July 28, 2008;

    (iii)   Between June 2, 2008, and September 11, 2009, the Days Inn 4107 Account received $2,317,587 from several sources traceable to Napoles's criminal proceeds: Napoles's Philippine bank accounts at Metropolitan Bank and HSBC Manila, Key West Trading's account at Banco de Oro Universal Bank (Philippines), Edzen Enterprises' account at Rizal Commercial Bank, and the Days Inn 9788 Wells Fargo Account (which, as noted above, itself had received $769,860 from Key West Trading).  Between August 28, 2008, and September 16,

2009, the Days Inn 4107 Account wrote checks totaling $83,162 to the Lim 3383 Account.

159. On October 8, 2009, the Days Inn 4107 Wells Fargo Account also made the final lump-sum mortgage payment of $693,290.79 to World Savings Bank, which paid off the remaining balance owed on the mortgage on the Irvine House.[6]

160. During the time when Reynald Lim made the mortgage payments on the Irvine House, he did not have income aside from some employment connected to the Anaheim Motel, which was purchased with proceeds of Napoles's schemes. According to state of California labor records, zero wages were reported for Reynald in 2005 and 2006; between 2007 and 2009, his only income, which remained under $60,000 per year, was from the Anaheim Motel, which was purchased with stolen funds. Reynald Lim's wife, Ana Marie, also did not earn sufficient income to purchase a $1.4 million home and pay off the entire mortgage in two and a half years. In addition to receiving some illicit income (from the operations of the Anaheim Motel and the money derived from the Covina Real Property), she worked as a nurse during the period when she and her husband acquired and paid off the mortgage on the Irvine House. Her earnings from these three

---

[6] This is the same account that received $1.4 million from the Philippines between July 8, 2009, and September 17, 2009, as alleged above with respect to the Anaheim Motel. It also received $649,980 from Key West Trading on October 7, 2009.

sources peaked at $17,696.25 during one quarter of 2008, well below the cost of the Irvine House and the mortgage payments made.

    **d. <u>The Ritz-Carlton Proceeds Were Generated By the Sale of the Ritz-Carlton Residence That Was Purchased with Napoles's Criminal Proceeds</u>**

    161.  In addition to the multi-million dollar cash down payments and mortgage payments being made by Napoles during the period beginning in September, 2006, Napoles also used criminal proceeds from the Philippines to purchase the $1.28 million Ritz-Carlton Residence in Los Angeles for her 21-year-old daughter Jeane Catherine Napoles, then a fashion merchandising student, to live in.  Jeane Napoles sold the Ritz-Carlton Residence in June, 2014, and deposited the resulting proceeds (the Ritz-Carlton Proceeds) into four U.S. bank accounts.

    162.  The Ritz-Carlton Proceeds total $984,173.40, consisting of the funds remaining in four bank accounts that received: (i) $1,063,767.43 in net proceeds from the June 2014 sale of the Ritz-Carlton Residence and (ii) $33,529.80, which represent proceeds, in the form of liquidated damages, from a purchaser who failed to complete the sale of the Ritz-Carlton Residence.

### i. Napoles's Purchase of the Ritz-Carlton Residence with Proceeds of Napoles's Scams

163.   Napoles purchased the Ritz-Carlton Residence for approximately $1.28 million in July 2011 in the name of her daughter, Jeane.

164.   On July 12, 2011, Jeane Napoles issued a $128,000 check as a down payment for the purchase of the Ritz-Carlton Residence.  The memo on the check stated "37I deposit."  "37I" is the apartment number for the Ritz-Carlton Residence.  Bank records show that this check was funded with $229,948 in transfers from Janet Napoles to a Bank of America account held in Jeane Napoles's name, account number ending with 7674.

165.   On July 14, 2011, wire transfer records show that Edzen Enterprises wired $1,151,978.00 from the Philippines to First American Title Company to complete the purchase of the Ritz-Carlton Residence.

166.   As alleged above, Edzen Enterprises is a money remitter used by Napoles to send her criminal proceeds to the United States.

### ii. Jeane Napoles Declared Under Oath that the Ritz-Carlton Residence Was Bought By Her Parents

167.   Jeane Napoles has admitted that her parents were the true owners of the Ritz-Carlton Residence purchased in her name. She made this admission in a notarized statement to the

Philippine Consul General in London in January 2014, in response to allegations that she had undeclared income and owed taxes in the Philippines, based on her ownership of the Ritz-Carlton Residence and a property in the Philippines.

168.  In her affidavit, which notes that Jeane Napoles was represented by counsel in the tax proceeding, she states, "I do not earn any income from any source whatsoever." She also confirms that she had no income in 2011, when she bought the Ritz-Carlton Residence, and "relied solely on the allowances provided by my parents." She adds, "I was completely and entirely financially dependent on my parents when said properties were acquired." Jeane Napoles also claims that the Ritz-Carlton Residence "was actually bought by my parents and transferred in my name in trust for my family." She avers, "I was only made a trustee by my parents, that both properties belong to my parents and never actually and legally belonged to me."

169.  Indeed, Jeane Napoles's background makes it highly unlikely that she did have legitimate income sufficient to purchase the Ritz-Carlton Residence. At the time, she had a high-school degree and was a full-time student pursuing an Associate of Arts degree in Apparel Manufacturing at the Fashion Institute of Design and Merchandising in Los Angeles. Moreover,

69

at the time she took title to the Ritz-Carlton Residence, Jeane
Napoles was present in the United States on an F-1 student visa,
which did not permit her to work.

170.   While Jeane Napoles's affidavit refers to her
"<u>parents</u>" (emphasis supplied), Jeane Napoles's father, Jaime,
could not have independently provided legitimate income to fund
the purchase of the Ritz-Carlton Residence.

171.   First, the Ritz-Carlton Residence was purchased with
a check funded by a wire from Janet Napoles (not her husband),
and most of the purchase money was funded by a wire from Edzen
Enterprises, which Napoles's former finance officer Luy
explained was used by Napoles to send money from her schemes to
the United States.

172. Further, according to public reports, Jaime Napoles,
who resides in and is a citizen of the Philippines, failed to
file any tax returns for 2004, 2006, 2008, 2010, 2011, or 2012,
and his tax return for 2009, filed separately from his wife's,
declared that he had no taxable income.

173.   In addition, according to Philippine court records,
the funds in Jaime Napoles's bank accounts in the Philippines
have been frozen by a Philippine court, which found probable
cause to believe that the accounts were linked to the PDAF

scandal and that the funds therein were not legitimately acquired.

### iii. The Sale of the Ritz-Carlton Residence Generated the Ritz-Carlton Proceeds

174.  News sources reported that the Ritz-Carlton Residence was first listed for sale in September, 2013, within weeks of Napoles's arrest by Philippine law enforcement authorities.

175.  On May 30, 2014, Jeane Napoles signed a Residential Purchase Agreement to sell the Ritz-Carlton Residence for $1,335,000.00.  When these prospective buyers cancelled their purchase, Escrow World (the escrow company for the transaction) sent cancellation instructions providing for $33,600.00 to be disbursed to Jeane Napoles as liquidated damages in connection with this cancellation.  On June 13, 2014, Escrow World wired $33,529.80 to the Jeane Napoles Citibank Checking Account.

176.  A deed memorializing the sale of the residence by Jeane Napoles to a buyer was executed on June 25, 2014.  At the time, Jeane Napoles was attempting to launch an internet start-up in the fashion industry, called ImFashioNinja.  Jeane Napoles opened two separate accounts at Citibank for ImFashioNinja on June 18, 2014, just days before the sale of the Ritz-Carlton Residence closed: the ImFashioNinja Checking Account and the ImFashioNinja IMMA Account.

177.  On or about June 25, 2014, Jeane Napoles caused Escrow World to wire the net sale proceeds to three different accounts: $180,000.00 to the Jeane Napoles Bank of America 1361 Checking Account; $310,000.00 to the Jeane Napoles Citibank Checking Account; and $573,767.43 to the ImFashioNinja LLC IMMA Account.

178.  On July 1, 2014, Jeane Napoles withdrew $130,000 from the Jeane Napoles Citibank Checking account and deposited it into the ImFashioNinja Checking Account.

179.  In summary, the proceeds from the sale of the Ritz-Carlton Residence ended up in the following accounts controlled by Jeane Napoles:

(i)  $180,000.00 in the Jeane Napoles Bank of America 1361 Checking Account;

(ii) $130,000.00 in the ImFashioNinja Checking Account;

(iii)$573,767.43 in the ImFashioNinja IMMA Account; and

(iv) $213,529.80 in the Jeane Napoles Citibank Checking Account.

180.  On July 2, 2014, ImFashioNinja LLC applied for an U.S. E-2 investor visa for Jeane Napoles.  The visa application stated that ImFashioNinja was founded in 2014, and described Jeane Napoles as its "president and founder."  The incorporation papers attached to the application showed that ImFashioNinja was

incorporated in Delaware on June 10, 2014.  The visa application further stated that Jeane Napoles had invested $130,000.00 in ImFashioNinja, and explained that the $130,000 investment was funded by the sale of Jeane Napoles's real property.  The visa application for ImFashioNinja did not identify any source of funding for ImFashioNinja aside from Jeane Napoles's sale of real property.

181.  On or about August 6, 2014, seizure warrants for the Ritz-Carlton Proceeds issued from the United States District Court for the Central District of California, based on a showing that there was probable cause to believe that the Ritz-Carlton Proceeds were the proceeds of foreign offenses involving the bribery of a public official or the misappropriation of public funds, and were property involved in violations of 18 U.S.C. § 1957, or a conspiracy to commit such offenses.

182.  The execution of the seizure warrants resulted in the seizure of a total of $984,183.40: $827,887.21 from the ImFashioNinja Checking Account; the ImFashioNinja IMMA Account, and the Jeane Napoles Citibank Checking Account, and $156,296.19 from the Jeane Napoles Bank of America 1361 Checking Account. These funds remain in the custody of the U.S. government.

### e. **The Defendant Business Assets were Generated by the Anaheim Motel, which was Acquired with Napoles's Criminal Proceeds**

183.  In 2011, Solution Strategies recommended to Napoles that she hire a professional management team for the Anaheim Motel.  Western Investment, through Reynald Lim and Jo Christine Napoles, then hired a third-party management company.  The management company opened bank accounts on behalf of the Anaheim Express Inn at JPMorgan Chase and held the money in trust for Western Investment Corporation, the owner of the Anaheim Motel.

184.  The management company maintains three bank accounts for the Anaheim Motel's operations.

185.  First, it maintains an operating account (JP Morgan Chase Account 563766539), which is used to deposit checks and cash, write paychecks and manage payroll.

186.  Second, it maintains a manager's account (JP Morgan Chase Account 563767867), used by the hotel manager to pay expenses.

187.  Third, it maintains a savings account (JP Morgan Chase Account 3072393506), used to deposit excess funds from the operating account and to fund capital improvements.

188.  All three accounts are funded by revenues from the Anaheim Motel's operations.

189.   Thus, all three accounts contain proceeds traceable to the Anaheim Motel, which, in turn, was acquired with the proceeds of Napoles's bribery and kickback scams.

190.   Similarly, all of the Anaheim Motel's assets that were acquired from the proceeds of its operations are ultimately traceable to Napoles's criminal proceeds.

**f. The Defendant Porsche Was Purchased with Napoles's Criminal Proceeds**

191.   In addition to spending several million dollars on real estate in 2006 and 2007, Napoles also provided funds to purchase the Defendant Porsche for daughter Jo Christine Napoles.  The Defendant Porsche was purchased in Jo Christine Lim Napoles's name on July 23, 2007, from the Newport Auto Center in California.

192.   Jo Christine Napoles purchased the Defendant Porsche with a $56,636.89 cashier's check.  She charged the remaining $1,836 to a MasterCard in the name of Janet Lim Napoles.

193.   The cashier's check was purchased on July 23, 2007, with a check written from the Western Ventures Management Hanmi 0829 Account.

194.   The Western Ventures Management Hanmi 0829 Account received several large transfers traceable to Key West Trading, the Philippine money remitter Napoles used to transmit her

75

criminal proceeds, shortly before the purchase of the Defendant Porsche.  Specifically:

- On July 11, 2007, a $150,000 check was written from the Reynald and Ana Marie Lim Hanmi Account and deposited in the Western Ventures Management Hanmi 0829 Account.  As alleged above with regard to the Irvine House, this check is traceable to Key West Trading.

- On July 12, 2007, the Western Ventures Management Hanmi 0829 Account received a $199,975 incoming wire from Key West (Banco de Oro) in the Philippines.

- On July 12, 2007, the Western Ventures Management Hanmi 0829 Account received a $199,975 incoming wire from Key West (Banco de Oro) in the Philippines.

- On July 13, 2007, the Western Ventures Management Hanmi 0829 Account received a $299,975 incoming wire from Key West (Banco de Oro) in the Philippines.

- On July 17, 2007, the Western Ventures Management Hanmi 0829 Account received a $99,975 wire from Key West (Banco de Oro) in the Philippines.

195.  While the Key West transfers above also funded the $519,000 down payment for the Irvine House, the total amount of the transfers of criminal proceeds from the Philippines by this

time- $799,900 - was more than enough to also fund the $56,636.89 cashier's check used to purchase the Defendant Porsche.

196.   In July 2007, Western Ventures Management Hanmi 0829 Account also received numerous small deposits - mostly payments on behalf of guests staying at the Anaheim Motel - totaling approximately $86,061.10.  As proceeds generated by the Anaheim Motel, which was purchased with the proceeds of Napoles's scams, these smaller deposits are also traceable to Napoles's illegal conduct.

### g. Napoles Used Her Criminal Proceeds to Acquire the Defendant Solution Strategies Shares of Stock

197.   In or about 2011 to 2012, in addition to buying the $1.28 million defendant Ritz-Carlton Residence, Napoles also had cash available to her to wire approximately $1,000,000 to the United States to acquire the Defendant Solution Strategies Shares, which represents a 19% holding in Solution Strategies.

198.   As with other properties named as defendants in this action, Napoles made her purchase with stolen public funds, using the money remitter Edzen Enterprises.

199.   Solution Strategies, is a consulting company that, according to its website, focuses on the "world's environment, economic, and community concerns."

77

200.   The majority owners of Solution Strategies are a married couple who operate the company.  In 2011, the couple met with Napoles in California.  Napoles ultimately decided to invest in Solution Strategies, and brought the couple on multiple trips to the Philippines to meet with her contacts. She also engaged the company to help manage the Anaheim Motel and Covina Real Property.

201.   Napoles used Edzen Enterprises to send criminal proceeds to the United States to purchase the shares in Solution Strategies.

202.   Napoles initially invested $500,000 in July, 2011, pursuant to a Stock Purchase Agreement executed on July 18, 2011, which provided that she would purchase 2000 shares at $250 a share.  On July 20, 2011, Edzen Enterprises' account at Rizal Commercial Bank in the Philippines wired $499,978 to a Solution Strategies Union Bank account.  Solution Strategies' Stock Transfer Ledger confirms Napoles's purchase of 2000 shares.

203.   Napoles purchased an additional 2500 shares of Solution Strategies at $200 per share in 2012.  To fund her purchase, she sent two wires totaling nearly $500,000 in July, 2012.  The first wire, for $299,978, came from Edzen Enterprises' account at Rizal Commercial Bank on July 11, 2012. Solution Strategies' Union Bank account received a second wire,

for $199,975, which Napoles caused Luy to send, using an Edzen Enterprises account at Banco de Oro (Philippines), on July 17, 2012.  At her direction, Luy sent an additional $9,982 from Edzen Enterprises to Solution Strategies on September 14, 2012.

204.  In July, 2012, Napoles transferred 225 of her 4,500 shares in Solution Strategies to the daughter of the two largest shareholders of the company, leaving Napoles with 4,275 shares in total, representing 19% of Solution Strategies.

## FIRST CLAIM FOR FORFEITURE

(18 U.S.C. § 981(a)(1)(C))

205.  Paragraphs 1 through 198 above are incorporated by reference as if fully set forth herein.

206.  Pursuant to 18 U.S.C. § 981(a)(1)(C), "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity,'" or a conspiracy to commit specified unlawful activity, is subject to forfeiture to the United States.

207.  "Specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7)(A) and (c)(7)(B)(iv) to include, among other things, (i) foreign offenses involving "the misappropriation, theft, or embezzlement of public funds by or for the benefit of

a public official"; (ii) foreign offenses involving bribery of a public official; (iii) transportation of stolen or fraudulently obtained money (18 U.S.C. § 2314); and (iv) receipt of stolen money (18 U.S.C. § 2315).

208.   As set forth above, the defendant assets are property that constitute or are derived from proceeds traceable to bribery of a public official or the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official, in violation of the laws of the Philippines, as well as the transportation and receipt of property stolen or taken by fraud.

209.   The foreign offenses at issue include violations of Section 3 of the Philippines' Republic Act No. 3019 (Anti-Graft and Corrupt Practices Act), Philippines' Republic Act No. 7080 (Plunder); and Article 212 of the Philippines' Revised Penal Code (Corruption of Public Officials).

210.   Therefore, the defendant assets are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C), on the grounds that they constitute or are derived from proceeds traceable to a specified unlawful activity, or a conspiracy to commit a specified unlawful activity.

## SECOND CLAIM FOR FORFEITURE

(18 U.S.C. § 981(a)(1)(A))

211.   Paragraphs 1 through 198 above are incorporated by reference as if fully set forth herein.

212.   Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section . . . [18 U.S.C. § 1957], or any property traceable to such property" is subject to forfeiture to the United States.

213.   18 U.S.C. § 1957 imposes a criminal penalty on any person who:

> knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity.

214.   For purposes of Section 1957, "specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7)(A) and (c)(7)(B)(iv) to include, among other things, (i) foreign offenses involving "the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official"; (ii) foreign offenses involving bribery of a public official; (iii) transportation of stolen or fraudulently obtained money (18 U.S.C. § 2314); and (iv) receipt of stolen money (18 U.S.C. § 2315).

81

215.  As set forth above, the defendants were the subjects of, or traceable to, monetary transactions or attempted transactions involving criminally derived property of a value greater than $10,000 and, for the reasons set forth above, the funds involved in those transactions were derived from specified unlawful activity, that is, (i) foreign offenses involving "the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official"; (ii) foreign offenses involving bribery of a public official; (iii) the transportation of stolen or fraudulently obtained money (18 U.S.C. § 2314); and (iv) the receipt of stolen money (18 U.S.C. § 2315).  The foreign offenses at issue are as set forth in paragraph 24 above.

216.  Therefore, the defendants are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A), on the grounds that they were involved in transactions or attempted transactions in violation of 18 U.S.C. § 1957, or are traceable to such property.

## THIRD CLAIM FOR FORFEITURE

### (18 U.S.C. § 981(a)(1)(A))

217.  Paragraphs 1 through 198 above are incorporated by reference as if fully set forth herein.

82

218.   Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of [18 U.S.C. § 1956], or any property traceable to such property" is subject to forfeiture to the United States.

219.   18 U.S.C. § 1956(a)(1) imposes a criminal penalty on any person who:

> knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity –
>
> . . .
>
> > (B) knowing that the transaction is designed in whole or in part –
> >
> > > (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity[.]

220.   For purposes of Section 1956, "specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7)(A) and (c)(7)(B)(iv) to include, among other things, (i) foreign offenses involving "the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official"; (ii) foreign offenses involving bribery of a public official; (iii) transportation of stolen money (18 U.S.C. § 2314); and (iv) receipt of stolen money (18 U.S.C. § 2315).

221.   As set forth above, the defendants were the subject of, or traceable to, financial transactions or attempted financial transactions, and the funds involved in those transactions were derived from specified unlawful activity, that is, (i) foreign offenses involving "the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official"; (ii) foreign offenses involving bribery of a public official; (iii) the transportation of stolen or fraudulently obtained money (18 U.S.C. § 2314); and (iv) the receipt of stolen money (18 U.S.C. § 2315) The foreign offenses at issue are as set forth in paragraph 24 above.

222.   Also, as set forth above, the transactions were designed in whole or in part to conceal or disguise the source, ownership, or control of the proceeds of specified unlawful activity, in numerous ways.

223.   Therefore, the defendants are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A), on the grounds that they were involved in transactions or attempted transactions in violation of 18 U.S.C. § 1956(a)(1)(B)(i), or are traceable to such property.

### FOURTH CLAIM FOR FORFEITURE

(18 U.S.C. § 981(a)(1)(A))

224.   Paragraphs 1 through 198 above are incorporated by reference as if fully set forth herein.

225.   Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of [18 U.S.C. § 1956], or any property traceable to such property," is subject to forfeiture to the United States.

226.   18 U.S.C. § 1956(a)(2) imposes a criminal penalty on any person who:

> transports, transmits, or transfers, or attempts to transport, transmit or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States—
>
> . . .
>
> > (B) knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part—
> >
> > > (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of

85

specified unlawful activity[.]

§ 1956(a)(2)(B)(i).

227.   For purposes of Section 1956, "Specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7)(A) and (c)(7)(B)(iv) to include, among other things, (i) foreign offenses involving "the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official";(ii) foreign offenses involving bribery of a public official; (iii) transportation of stolen money (18 U.S.C. § 2314); and (iv) receipt of stolen money (18 U.S.C. § 2315).

228.   As set forth above, the defendant properties were involved in the transportation, transmission, or transfer of funds, or attempted transportation, transmission, or transfer of funds, affecting interstate or foreign commerce, to a place in the United States from or through a place outside the United States, with proceeds of "some form of unlawful activity," that is (i) foreign offenses involving "the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official"; (ii) foreign offenses involving bribery of a public official; (iii) the transportation of stolen or fraudulently obtained money (18 U.S.C. § 2314); and (iv) the receipt of stolen money (18 U.S.C. § 2315) The foreign offenses at issue are as set forth in paragraph 24 above.

86

229.  As further set forth above, such transfers or attempted transfers were conducted with the knowledge that the property involved represented the proceeds of some form of unlawful activity, and that such transfers or attempted transfers were designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of specified unlawful activity.

230. Accordingly, the defendant properties are subject to forfeiture to the United States under 18 U.S.C. § 981(a)(1)(A) on the grounds that they constitute property involved in transactions or attempted transactions in violation of 18 U.S.C. § 1956(a)(2)(B)(i), or are traceable to such property.

## FIFTH CLAIM FOR FORFEITURE

(18 U.S.C. § 981(a)(1)(A))

231.  Paragraphs 1 through 198 above are incorporated by reference as if fully set forth herein.

232.  Pursuant to 18 U.S.C. § 981(a)(1)(A), "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of [18 U.S.C. §§ 1956 or 1957], or any property traceable to such property," is subject to forfeiture to the United States.

233.   Title 18, U.S.C. § 1956(h) imposes a criminal penalty on any person who "conspires to commit any offense defined in [18 U.S.C. §§ 1956 or 1957]."

234.   As set forth above, the defendant properties were involved in a conspiracy to conduct, or attempt to conduct, transactions in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i),(a)(2)(B)(i), and/or 1957, affecting foreign commerce, that involved the proceeds of specified unlawful activity, that is, (i) foreign offenses involving "the misappropriation, theft, or embezzlement of public funds by or for the benefit of a public official"; (ii) foreign offenses involving bribery of a public official; (iii) the transportation of stolen or fraudulently obtained money (18 U.S.C. § 2314); and (iv) the receipt of stolen money (18 U.S.C. § 2315).  The foreign offenses at issue are as set forth in paragraph 24 above.

235.   Accordingly, the defendant properties are subject to forfeiture to the United States under 18 U.S.C. § 981(a)(1)(A) on the grounds that they constitute property involved in transactions or attempted transactions in violation of 18 U.S.C. § 1956(h), or are traceable to such property.

## CLAIM FOR RELIEF

WHEREFORE plaintiff, the United States of America, requests that judgment be entered in its favor and against the defendants; process issue to enforce the forfeiture of the defendants; all persons having an interest in the defendants be cited to appear and show cause why the forfeiture should not be decreed; this Court decree forfeiture of the defendants to the United States of America for disposition according to law; and that this Court grant the United States such further relief as this Court may deem just and proper, together with the costs and disbursements in this action.

DATED: March 21, 2016          M. KENDALL DAY, CHIEF
                               ASSET FORFEITURE AND MONEY
                               LAUNDERING SECTION, Criminal
                               Division


                                  _/s/ Michael W. Khoo_
                               MARY K. BUTLER, Deputy Chief
                               DANIEL H. CLAMAN, Principal
                               Assistant Deputy Chief
                               MICHAEL W. KHOO, Trial Attorney
                               Criminal Division
                               United States Department of
                                          Justice

                               EILEEN M. DECKER
                               United States Attorney
                               STEVEN R. WELK
                               Assistant United States Attorney
                               Chief, Asset Forfeiture Section
                               JONATHAN GALATZAN
                               Assistant United States Attorney

                               Attorneys for Plaintiff
                               UNITED STATES OF AMERICA

## VERIFICATION

I, Sean Fern, hereby verify and declare under penalty of perjury that I am a Special Agent with the Federal Bureau of Investigation, that I have read the foregoing Verified Complaint for Forfeiture *in Rem* and know the contents thereof, and that the matters contained in the Verified Complaint are true to the best of my knowledge and belief.

The sources of my knowledge and information and the grounds of my belief are official files and records of the United States, publicly available files and historical information, information supplied to me by other law enforcement officers, experts, and other witnesses, including in the Philippines, as well as my investigation in this case, together with others, as a Special Agent of the Federal Bureau of Investigation.

I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 21st day of MARCH , 2016, at Los Angeles, CA .


_____
Sean Fern
Special Agent
Federal Bureau of Investigation

91

## CERTIFICATE OF SERVICE

The undersigned certifies that on this 21st day of March, 2016, the foregoing FIRST AMENDED VERIFIED COMPLAINT FOR FORFEITURE IN REM was served via the Court's CM/ECF System on counsel of record for all parties in accordance with Local Rule 5-3.2.1.

*/s/ Michael W. Khoo*
Michael W. Khoo
Trial Attorney